## Comly *versus* Hillegass.

1. H. gave a check to a county agricultural society to pay the entrance fee to enable him to enter his horse at an exhibition given by the society.     The object was to enable him to have his horse entered to compete for the premiums offered by the society for trials of speed: *Held*, that the check was given for an illegal purpose and no recovery could be had thereon.

2. Unger *v.* Boas, 1 Harris 601, followed.

March 23d 1880.     Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.

Error to the Court of Common Pleas of *Montgomery county:* Of January Term 1879.     No. 235.

Case stated wherein S. W. Comly, to the use of the Montgomery County Agricultural Society, was plaintiff, and Warren H. Hillegass, defendant.

The case, as stated, was as follows :

It is agreed that the above-named defendant gave his check, dated August 30th 1875, for the sum of $120, to pay the entrance fee to the plaintiff to enable him to enter his horse at the exhibition to be held by the plaintiff on September 21st, 22d, 23d and 24th 1875, at their exhibition grounds at Ambler, in said county.     The defendant, by paying said entrance fee, according to the rule on page 5, of plaintiff's book, was entitled to have his horse entered to compete for the premium offered for trials of speed in Class No. 2, first day, and Class No. 6, third day.

It is further agreed that said check was protested October 4th · 1875, and that the only contest was for the premium offered by the plaintiff, as appears upon page 5 of their book, and that the entrance fee thus paid enters into the general fund of the plaintiff.

It is further agreed that the above-named defendant was suspended by the national association, under their rules, November 24th 1875.

It is agreed that if the court should be of opinion that the plaintiff is entitled to recover, then judgment to be entered for the plaintiff for $134.32; if not, then judgment for defendant, both parties reserving the right to sue out a writ of error to the Supreme Court.

[Comly *v.* Hillegass.]

The rules on page 5, above alluded to, were as follows:

" CONDITIONS :—Entrance fee ten per cent. of the whole amount of premiums.

Entries to close Monday, August 30th.

No conditional entries received.

All trotting to be three in five to harness, except when specified to be otherwise, and to be governed by the rules of the National Association, and all entries must be made in strict accordance therewith.

When eight or more horses start, the distance will be one hundred yards. Heats in each day's trotting will be alternate. If required, classes in each days' trotting will be called without regard to order of number.

Four-in-hand team entries not required to name the horses until September 22d, before 7 P. M. Distance named in this class.

Drivers will be required to wear colors. Any driver who has adopted his color will please name it with his nomination. Trotting to commence each day at two o'clock.

Entries to be made to                    S. W. COMLY,
                                         Whitemarsh, P. O."

The court, Ross, P. J., entered judgment for the defendant on the case stated, in an opinion, saying:

" A wager is defined in Bouvier's dictionary as a ' bet; a contract by which two parties or more agree that a certain sum of money or other valuable thing shall be paid or delivered to one of them on the happening or not happening of an uncertain event.' A wager at common law was not void unless the event upon which it depended was *contra bonos mores*. Therefore a wager upon the event of a horse race was a lawful contract which could be enforced by legal remedies, and the sum or thing wagered could be recovered by action. As civilization developed, more correct moral views, and a broader spirit of public policy prevailed. It was seen that gambling in any form was most demoralizing to the gambler; and very early statutory action was taken by the British Parliament. The progress of legislation on the subject will be found fully traced in Jacobs's Law Dictionary, tit. *Gambling*.

" The same spirit pervaded the legislation of the Commonwealth beginning in provincial days. A brief history of this legislation may not be uninteresting. By the Act of February 17th 1762, 1 Sm. Laws 246, it was enacted that unlawful games, called lotteries, have been set up, and it declares them to be common and public nuisances, and against the common good and welfare of the province. The preamble embodies the spirit to which I have referred. It is in these words : ' Whereas, many mischievous and unlawful games, called lotteries, have been set up in this province, which tend to the manifest corruption of youth, and the ruin and impoverishment

[Comly *v.* Hillegass.]

of poor families; and, whereas, such pernicious practices may not only give opportunities to evil disposed persons to cheat and defraud the honest inhabitants of this province, but prove introductive of vice, idleness and immorality, injurious to trade, commerce and industry, and against the common good, welfare and peace of this province; for remedy whereof be it,' &c. This most excellent preamble not only proves the wisdom of our Quaker ancestry, their morality, and vindicates their title to be called Friends, but is also the best summary of the evils arising from all gambling. This legislation was followed by the Act of the 20th of January 1792, and extends the Act of 1762 to vending tickets of lotteries carried on and maintained in other states : sect. 3, Sm. Laws 60. This also has a preamble embodying the same spirit. * * *

"The next statute was the Act of April 22d 1794, entitled 'A further supplement to an act entitled An act for the support of the government of this Commonwealth.' This supplement by sect. 5, *vide* 3 Sm. Laws 180, forbids all betting on cock fights as well as cock fights themselves, all dicing or card playing for money on a public highway, as well as the playing billiards, bowls, shuffleboards, or any game of hazard for any valuable thing ; and also forbids and prohibits horse racing for anything of value. Sect. 6 forbids all keepers of licensed houses to permit any games of address, hazard, cock fighting, bullet playing and horse racing, or to promote or encourage them. Sect. 8 declares that no person shall be compelled to pay any money or deliver any valuable article staked as a wager upon the result of the games already mentioned, and avoids all evidences of indebtedness given to secure such indebtedness. Sect. 9 provides that the loser, if he pays, may recover the forfeit.

"By the Act of April 1811, 5 Sm. Laws 267, there was a departure from this wise policy of the preamble already cited; but it was made in the interest of internal improvements in the spirit of which the legislature seems to have been willing 'to do evil that good might come of it.' This act was entitled 'An act to incorporate the Union Canal Company of Pennsylvania.' Sect. 27 provided that no lottery tickets should be sold except such as are authorized by the laws of the state; and sect. 28 authorized the president, &c., to raise by lottery $340,000. It further degraded the state by appointing managers of this lottery, farmed out the right to hold it, involved the executive by directing him to appoint five commissioners to superintend the drawing, &c., &c. The present condition of the canal is a commentary upon this action.

"The next legislation I have been able to discover is again in the right direction. It is the Act of the 18th of March 1816, 6 Sm. Laws 357. It is entitled 'A further supplement to the act entitled an act for the prevention of vice and immorality, and of unlawful

gaming, and restraining disorderly sports and dissipation.' By it all persons under a heavy penalty are forbidden to set up or expose to be played at for money or other valuable thing any E. O. table (a game I presume now out of date), faro bank or any other game or device with cards or dice, or any other games of address or hazard.

"The next statute is that of the 24th of March 1817, 6 Sm. Laws 462, entitled 'An act to prevent the practice of wagering or betting on elections.' These acts were followed by that of 12th of March 1830, imposing additional penalties for cock fighting, Pamph. L. 8, sect. 1. The act of March 11th 1834, Pamph. L. 122, sects. 18, 19, 20, re-enacts the laws already existing as to inn-keepers, but differs in penalty. By the Act of 10th of April 1849, billiards were authorized by obtaining license, but no gambling was permitted, and the same privilege was extended to bowling saloons and ten-pin alleys, Pamph. L. of 1849, 573. This act was modified by the Act of May 15th 1850, sect. 2, Pamph. L. 772.

"I have thus followed the statutes against gambling generally. It seems proper, with a view to the facts in the case stated, to particularly trace the legislation in regard to horse racing. By the Act of February 17th 1820, sect. 1, 7 Smith's Law 244, horse racing was declared a public nuisance and offence against the state.

"By the 2d section of the act the horses thus employed were forfeited. By the 3d section, all wagers on horse races are declared void, and so also all contracts in consideration of such wagers. By the 3d section all moneys paid could be recovered. By the 4th section, all contributors to a purse, and for a horse race, and all persons collecting money for such purposes, were made liable to a penalty. By section 6, all advertisers of a race, and those who set them up, were subject to a penalty. These are our statutes against gaming and horse racing, and I have traced them with some care, many of them not being found in the general digest.

"It is now time to turn to the case stated. It is very apparent, under the statutes cited as to horse racing, that the trials of speed provided for and to enter which the check of the plaintiff was given, are nothing but horse racing. They are nuisances under the first section of the Act of 1820, already cited. All wagers and bets depending upon such trials of speed 'so-called,' horse racing in reality, and all executory contracts in relation thereto, are void, under section 3 of that act; and the horses engaged in such races are forfeited. A purse to be trotted for is gambling under the laws of Pennsylvania. The winner cannot recover the premium, purse stakes or prize, unless the company chooses to pay him. The horse of each contestant is forfeited, and the whole arrangement is a palpable evasion of the law. But there can be no evasion of the laws against gambling, as it has been well ruled in Wagonseller *v.* Smith,

[Comly *v.* Hillegass.]

7 Watts 343. The court in that case in a per curiam opinion well say, ' The act was intended to avoid all bets, paid or unpaid, and to suppress anything connected with the practice. It is the duty of the courts, therefore, to give it full effect, and not to force an actual wager into the similitude of something else.' To the same effect, and broadly sustaining this position, are the following cases cited by the defendant; 7 Johns. N. Y. Rep. 434; 10 Johns. 406; Bine's Appeal, 5 P. F. Smith 294; Marten *v.* Gheen et al., 25 Id. 166; Kirkpatrick *v.* Bonsal, 22 Id. 155.; 1 Denio 170; Unger *v.* Boas, 1 Harris 60; Myrlonger *v.* Springer, 3 W. & S. 405. But I do not think this conclusion is at all decisive of the case stated.

"The defendant here is not, under the facts, under the operation and effect, either of the 1st, 2d, 3d or 4th sections of the Act of the 17th of February 1820. He laid no money by giving his check to the result of any race. He neither laid, betted nor made any wager on the racing, running, pacing or trotting of horses, mares or geldings, as provided in the 3d section. All that he did, when he paid his entrance money of ten per cent. by an executory contract, was to violate the 5th section of that act, which provides that ' If any person shall contribute to or collect, or shall ask or desire any other person to contribute to or collect any money, goods or chattels to make up a purse, plate, or other thing to be run, paced or trotted for as aforesaid, at any place within this Commonwealth, such persons so offending shall pay and forfeit the sum of $30 for each offence.' Now all that the defendant did was to contribute. Could he, under existing legislation, recover the amount paid in by him? Clearly not, in the absence of statutory provision, for he was in *pari delicto* with the plaintiff. Horse racing was lawful at common law; a wager upon it was, therefore, by the same authority lawful; and its recovery, or rather the recovery of the sum wagered could have been enforced by action. Where statutes derogate from the common law they must be strictly pursued; and when penal, as in the case of a forfeiture, must be strictly construed. For his act a penalty is imposed. Suppose defendant had paid the money? He would be liable to the penalty, and could not recover the amount. The society and himself being in *pari delicto* and *arcades ambo*, the penalty could have been exacted from him for contributing; from the society for soliciting the contribution. The contribution is a fact that inflicts the penalty.

"Again, he paid only for the privilege of entering his horse in a trial of speed; he obtained that privilege, but did not exercise it. How then is the sum a wager? Is it laid, betted, or made on a wager to be determined by a horse race? There is nothing in the statutes of Pennsylvania which forbids a recovery here. But there is a fact in the case stated which, though it does not distinctly appear in the case stated, was admitted upon the argument. It is

[Comly *v.* Hillegass.]

embodied in rule 3, p. 22 of the by-laws of the 'National Association for the promotion of the interests of the American trotting turf,' handed to the court and considered a part of the case stated. It is as follows: 'Rule 3, Entrance Fee. The entrance fee shall be 10 per cent. of the purse, unless otherwise specified; and any person failing to pay his entrance dues may, together with his horse or horses, be suspended until they are paid in full, which shall be with an addition cf 10 per cent. penalty, and interest at 7 per cent. per annum until paid; the penalty to go to the National Association.'

" I have said both plaintiff and defendant, that is the equitable plaintiff and defendant, are in *pari delicto*. If they have, that is the equitable plaintiffs, imposed a penalty for non-payment, that and that alone is their remedy. They have determined how the delinquent shall be punished, viz., by suspension, by a ten per centum increase, and by seven per cent. interest. If their penalty be void, their contract is void. If their penalty be in force, the remedy is prescribed. Having designated their remedy, they are estopped from proceeding by law. This is their contract. It is either good or bad. If good, their contract remedy is their only remedy. If bad, there is no remedy. The logic of this reasoning is irresistible, and I am unable to see any escape from it.

" It would be well, I think, and I allude to it only by way of warning to agricultural societies in Pennsylvania, to read and reflect upon the provisions of sixth section of the Act of 1820, Purd. Dig. pl. 6, p. 760. It provides that, 'If any person or persons within this state shall print or cause to be printed, set up, or cause to be set up, any advertisement mentioning the time and place for the running, pacing, or trotting of any horses, mares or geldings, or shall knowingly suffer any advertisement as aforesaid to be set up, in or upon his, her or their dwelling house or outhouses, or shall knowingly suffer the same to remain up as aforesaid, any person so offending shall forfeit and pay the sum of $20.' This section, and the first of the same act, are especially worthy the attention of the managers of these societies. The first section declares that 'all running, pacing or trotting of horses, mares or geldings for money, goods or chattels, or other valuable things, shall be and are hereby declared to be common nuisances and offences against this state; and the authors, contrivers and abettors thereof shall be prosecuted and proceeded against by indictment.'

" All constables are bound to return common nuisances under oath at the next sessions; and these statutes are in full force and vitality. I have cited them as a warning."

The plaintiff took this writ, and alleged that the court erred in entering judgment for the defendant.

*Geo. W. Rogers* and *J. P. Hale Jenkins*, for plaintiff in error.

[Comly *v.* Hillegass.]

—The rule upon which the learned judge rested his decision has no application here. It is not included in the case stated. The simple question is whether the defendant, who agreed to pay for the privilege of exhibiting his horse at an agricultural fair, is bound to make good his part of the contract. It was not a contract to participate in a gambling transaction but only an exhibition.

*B. M. Boyer* and *L. M. Childs*, for defendant in error.—The contract was a wager under the Acts of April 22d 1794, Purd. Dig. 728, pl. 8, and of February 17th 1820, Purd. Dig. 759, pl. 3, and the check given in its performance was void. This court, in Unger *v.* Boas, 1 Harris 600, ruled that where a note had been given for chips to be used in playing at faro, it was void under the statute against gaming. In that case there was no play and no money lost before the note was given, and the arrangement was in fact two contracts; but this court ruled these to be, in law, but one, and void in toto. It is urged by the plaintiff, that defendant's horse not having trotted at the race, the money was not lost or laid on the trotting, &c., of horses, and that it is, therefore, collectible. But the contract was one by which each party hazarded money on the event of a contemplated horse race; it was a contract void at its inception, and all checks, &c., given to secure the money were also void; and no subsequent act or failure to act could give to either any validity.

The judgment of the Supreme court was entered, March 31st 1880,

PER CURIAM.—It is very evident that the check given by the defendant to pay the entrance fee to enable him to enter his horse at the exhibition was for an illegal purpose. The object is stated to have been to entitle him to have his horse entered to compete for the premiums offered by the society for trials of speed. In plain English there was to be a horse race—which beyond all question is in violation of the laws of this Commonwealth. It is directly within the principle of Unger *v.* Boaz, 1 Harris 601.

Judgment affirmed.